**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JAMES T. PATRICK AND WILLIAM : 
DEBUTTS, :
                              :      Civil Action No.: 25-cv-5053

             Plaintiff, :
                              :     **COMPLAINT FOR**
     - against -                :    **DECLARATORY JUDGMENT**
                              :      **AND INJUNCTIVE RELIEF**

FOCUS FINANCIAL PARTNERS, LLC; EDGE :
CAPITAL GROUP, LLC; AND SCS CAPITAL :
MANAGEMENT LLC                      x

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiffs James T. Patrick ("Patrick") and William deButts ("deButts") (together, "Plaintiffs") hereby file this Complaint against Defendants Focus Financial Partners, LLC ("Focus"), Edge Capital Group, LLC ("Edge Capital"), and SCS Capital Management, LLC ("SCS") (collectively "Defendants"), showing this Court as follows:

<u>**INTRODUCTION AND NATURE OF CLAIMS**</u>

        1.      Plaintiffs are registered investment advisors ("RIAs") who were formerly affiliated with ECG Management Holdings, LLC ("ECG"), the management company for Edge Capital. In 2018, when Focus, Edge Capital's parent, acquired Plaintiffs' former firms, Plaintiffs were required to execute the Management Agreement[1] which lies at the heart of this dispute. Among other improper and anticompetitive terms, the Management Agreement contains staggeringly overbroad restrictive covenants (the "Covenants"), which are designed: (1) to bind RIAs and their clients to Defendants into perpetuity; (2) to block RIAs who leave Defendants from fairly competing against Defendants or their Affiliated Companies; (3) to prohibit Defendants' former

---

[1] The Management Agreement is attached hereto as **Exhibit A**.

RIAs and their new employers from accepting business from clients of Defendants or their Affiliated Companies, irrespective of any solicitation or any material contact with those clients; and (4) to chill Defendants' clients from pursuing RIA services from anyone other than Defendants through the threat of legal entanglement. *See Mgmt. Agmt.* at §§ 2.10-2.13. Defendants imposed and now seek to enforce these Covenants despite actual knowledge they are overbroad, and that Defendants have no legally protectable interest in pursuing their anticompetitive goals. Defendants' effort to enforce these overbroad covenants damage their clients, the market, the RIA profession, and Plaintiffs and should be precluded.

2.       Plaintiffs resigned when Edge Capital announced its intention to enter into a transaction with SCS that was structured in a way that would benefit the larger percentage owners of Edge Capital's management company, of which Plaintiffs held small, minority membership interests through limited liability companies, at the expense of Plaintiffs.

3.       Following Plaintiffs' resignation, Defendants launched a campaign of intimidation designed to prevent Plaintiffs from engaging in the RIA business, from fairly competing, or from earning a living; and designed to chill those clients who might elect to do business with Plaintiffs from working with Plaintiffs at future potential employers.

4.       Among other things, Defendants (who are believed to be funded by private equity firms with comparatively unlimited resources) have: (1) sought to drive Plaintiffs from the RIA business by initiating arbitration to enforce the Covenants that Defendants **know** to be overly broad and unenforceable; (2) upon information and belief, defamed Defendants to their customers and business contacts, including at least one representative of Goldman Sachs; and (3) upon further information and belief, engaged in other misconduct designed to improperly restrain competition,

as discussed in detail below. Defendants' actions are specifically intended to accomplish indirectly what they are not entitled to accomplish legally.

5.      Defendants' actions are profoundly anticompetitive and violate not just decades of black letter New York jurisprudence—which clearly prohibits them from enforcing the dramatically unreasonable Covenants—but jurisprudence from jurisdictions across the Country.

6.      As intended, Defendants' actions have created uncertainty as to Plaintiffs' legal status and rights, have inhibited legitimate and entirely fair competitive activities, have intimidated and restrained clients from seeking out or using the RIAs of their choosing and, in so doing, are exposing Plaintiffs, their clients and their potential clients to immediate irreparable harm. Indeed, Plaintiffs have opportunities this moment that are being curtailed because of Defendants' threats.

7.      Accordingly, Plaintiffs seek declaratory relief in the form of a judgment declaring that the Covenants are irredeemably overly broad, cannot be judicially reformed, and are unenforceable as a matter of law. The controlling law clearly requires such relief.

8.      Plaintiffs further seek preliminary and permanent injunctive relief: (i) staying arbitration proceedings initiated by Defendants against Plaintiffs in the American Arbitration Association on or about June 5, 2025, pending final resolution of Plaintiffs' declaratory judgment action; (ii) precluding Defendants, and those with whom they act in concert, from otherwise enforcing or seeking to enforce (directly or indirectly) the Covenants; and (iii) for such other and further injunctive relief as is necessary, just, or appropriate.

## PARTIES

9.      Patrick is an individual residing in Chapel Hill, North Carolina. Patrick is a citizen of North Carolina.

10.      deButts is an individual residing in Atlanta, Georgia. deButts is a citizen of Georgia.

11.     Focus is a Delaware limited liability company which maintains its corporate headquarters at 875 3rd Avenue, 28th Floor, New York, New York 10022. Focus is wholly owned by Focus Financial Partners, Inc., a Delaware corporation with its principal place of business in New York. Therefore, Focus is a citizen of Delaware and New York.

12.     Edge Capital is a Delaware limited liability company which maintains its corporate headquarters at 888 Boylston Street, Suite 1010, Boston, Massachusetts, 02199. Edge Capital is wholly owned by Focus. Focus is wholly owned by Focus Financial Partners, Inc., a Delaware corporation with its principal place of business in New York. Therefore, Edge Capital is a Citizen of Delaware and New York.

13.     SCS is a Delaware limited liability company which maintains its corporate headquarters at 888 Boylston Street, Suite 1010, Boston, Massachusetts, 02199. SCS is wholly owned by Focus Operating, LLC and Focus SCS Holdings, Inc. Focus Operating, LLC is a wholly owned by Focus. Defendant Focus is wholly owned by Focus Financial Partners, Inc., a Delaware corporation with its principal place of business in New York. Focus SCS Holdings, Inc. is a Delaware corporation with its principal place of business in New York. Therefore, SCS is a citizen of Delaware and New York.

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because, as set forth above, the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. As set forth herein, Plaintiffs seeks a declaratory judgment that the Covenants are unenforceable and a preliminary and permanent injunction prohibiting Defendants from attempting to enforce the same. If the overbroad Covenants are enforced, Plaintiffs would individually suffer substantial hardship and loss of compensation far in

excess of $75,000 over the restricted period set forth in the Management Agreement. *See Correspondent Servs. Corp. v. First Equities Corp.*, 442 F.3d 767, 769 (2d Cir. 2006) ("[i]n actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.")

15.     This Court may exercise personal jurisdiction over Focus pursuant to CPLR § 301 and consistent with federal due process requirements because Focus is a citizen of, and maintains its principal place of business in, New York. Additionally, this Court may exercise personal jurisdiction over Focus because Focus purports to be a party to the Management Agreement, which it contends contains a valid and enforceable New York forum selection clause. *Mgmt. Agmt*. at § 8.3.

16.     This Court may exercise personal jurisdiction over Edge Capital consistent with New York law and federal due process requirements because Edge Capital is a citizen of New York, and further because Edge Capital purports to be a party to the Management Agreement, which it contends contains a valid and enforceable New York forum selection clause. *Id*.  Further, Edge Capital, directly and/or through its representatives, has threatened to enforce the Covenants while situated in New York.

17.     This Court may exercise personal jurisdiction over SCS consistent with New York law and federal due process requirements because (i) SCS is a citizen of New York (ii) SCS purports to have accepted an assignment of Edge Capital's rights and obligations under the Management Agreement, which it contends contains a valid and enforceable New York forum selection clause; (iii) SCS maintains an office in this jurisdiction and has engaged in many of the complained of activities in this jurisdiction; and (iv) SCS directly and/or through its representatives, has threatened to enforce the Covenants while situated in New York, meaning

significant portions of the conduct that has necessitated this Action have occurred in this jurisdiction. *Id.;* CPLR § 302(1) – (2).

18.    Venue is proper in this Court because the Management Agreement to which each of the Defendants purport to be bound contains a venue provision authorizing an action in this district, because it is the principal place of business of Focus (who is acting in concert with the other Defendants), and because Defendants are attempting to enforce the Covenants, directly and/or through their representatives, while situated in this jurisdiction. *Mgmt. Agmt*. at § 8.3.

## FACTUAL BACKGROUND

19.    Plaintiffs are RIAs with decades of experience in the financial planning and investment advisory industry.

20.    In 2014, Plaintiffs respectively became members of Edge Advisors, LLC ("Edge Advisors") and one of its affiliate firms. Edge Advisors and its affiliates collectively did business under the trade name "Edge Capital Partners."

### Defendant Focus Acquires Edge Capital Partners And Requires Plaintiffs To Sign The Management Agreement

21.    Focus is a subsidiary of and directly controlled by Focus Financial Partners, Inc., a large, New York-based investment firm which operates an extensive network of wealth management, business management, and related financial services firms.

22.    In early 2018, Focus approached the members of Edge Capital Partners with a proposal for an acquisition by Focus.

23.    The acquisition was approved. However, upon information and belief, but unbeknownst to Plaintiffs at the time, Defendants intentionally and strategically arranged the acquisition to create complex business structures to, among other things, circumvent regulatory requirements such as the Financial Industry Regulatory Authority ("FINRA") rules that prohibit

the types of restrictive covenants Defendants seek to enforce.

24.     The resulting entity, Edge Capital was formed on May 29, 2018 as a wholly owned subsidiary of Focus.

25.     Plaintiffs and the other members of Edge Capital Partners received a small minority interest in another entity, ECG, which was formed on July 19, 2018.  That entity is controlled by a management company, and Plaintiffs are treated like employees.

26.     On August 1, 2018, ECG and its members (including Plaintiffs) entered into a Management Agreement with Edge Capital and Focus, pursuant to which ECG and its members agreed to provide management oversight and other services to Edge Capital in exchange for a management fee. *See Mgmt. Agmt.* at §§ 2.2, 3.1.

27.     The Management Agreement purported to bind Plaintiffs to a set of remarkably broad Covenants, as set forth below. *See Id.* at §§ 2.10-2.13.

### Solicitation and Service Covenant

28.     Section 2.13(a) of the Management Agreement contains a client non-solicitation and non-service restrictive covenant misleadingly titled a "Non-Solicitation Covenant" (hereinafter referred to as the "Solicitation and Service Covenant").  The Solicitation and Service Covenant provides as follows:

> During the **Restricted Period**[2] (as defined below), neither [ECG] nor any **Principal**[3] shall in any function or capacity, whether for its or his or her own account or for the account of any other person or entity (other than [Edge Capital]),

---

[2] The "Restricted Period" is defined to include: "the period commencing on the date hereof and ending (i) with respect to each Principal, on the second anniversary of the termination of this Agreement or, if earlier, on the second anniversary of the date such Principal ceases to be a member of [ECG] and ceases to provide any management or other services to [ECG], [Edge Capital] and/or their affiliates, and (ii) with respect to the [ECG], on the second anniversary of the termination of this Agreement." *Mgmt. Agmt.* at § 2.13(a).

[3] The term "Principal" refers to the members of ECG and its affiliates and includes Patrick and deButts.

directly or indirectly, **solicit the sale of, market or sell** products or services similar to those sold or provided by [Edge Capital] to (i) **any person or entity** who is a **customer or client or a Prospective Client**[4] (as defined below) of [Edge Capital] **as of the date hereof**, any person or entity who is a **customer or client or Prospective Client** of [Edge Capital] **at the time of such action**, or any person or entity who, **during the twenty four (24) months preceding such action**, was a **customer or client** of [Edge Capital] (all of the foregoing, collectively, the "Company Clients") or (ii) to any person or entity who (x) is a **customer or client or Prospective Client** of any of the other **Affiliated Companies** as of the date hereof or at the time of such action, or (y) during the twenty four (24) months preceding such action, was a customer or client of any of the other Affiliated Companies, and in each case of clauses (x) and (y) above, whose name or identity **becomes known to the __Management Company or any Principal__** as a result of the Services or of the relationship of the Management Company or the Principals with Focus (the "Affiliated Company Clients").

*Id.* at § 2.13(a) (emphasis added).

29.    In other words, among other things, the Solicitation and Service Covenant purports to prohibit Plaintiffs, for two years, from—directly or indirectly, and in any capacity (except on behalf of Defendants)—soliciting, marketing, or selling investment advisory services or products to *anyone* that, within the preceding two years, was an actual or prospective client of Edge Capital or an actual or prospective client of any of Defendants' Affiliated Companies.  *Id.*

30.    As intentionally written, the Solicitation and Service Covenant is grossly overbroad, illegal and unenforceable.

---

[4] A "Prospective Client" is defined to include "any person or entity (i) with whom any of the employees or other personnel of the [Edge Capital], or any Principals (or, in the case of any Affiliated Company, any of the employees or other personnel of such Affiliated Company, or its principals), have had a telephone call or a face-to-face meeting at any time during the 24-month period prior to the relevant date of determination, (ii) who has been introduced in any manner (including by email, telephone call or a face-to-face meeting) to [Edge Capital], including its employees or other personnel, or any Principals (or, in the case of any Affiliated Company, any of the employees or other personnel of such Affiliated Company, or its principals) by a Client (or a former Client) or by a solicitor (including through a custodian referral program), or who has otherwise been solicited by or on behalf of [Edge Capital], including its employees or other personnel, or any Principals (or, in the case of any Affiliated Company, any of the employees or other personnel of such Affiliated Company, or its principals) to become a Client, at any time during the 24-month period prior to the relevant date of the applicable action." *Id.* at § 2.13(a).

## Solicitation and Hiring Covenant

31.     Section 2.13(b) of the Management Agreement contains an employee non-solicitation and non-hiring covenant (the "Solicitation and Hiring Covenant") which provides as follows:

> During the **Restricted Period**, neither [ECG] nor any Principal shall, directly or indirectly, (i) **initiate contact with or directly or indirectly solicit any employee of [Edge Capital] or any other Affiliated Company**, or any person employed by [Edge Capital] or **any other Affiliated Company** at any time during the term of this Agreement, with the intent of hiring such employee, (ii) **hire or otherwise engage any such employee or former employee** (but only during the twelve (12) month period following such former employee's separation from [Edge Capital] or Affiliated Company, as applicable), (iii) induce or otherwise counsel, advise or encourage any such employee to leave the employment of [Edge Capital] or any other Affiliated Company, or (iv) induce any supplier, licensor, licensee, business relation, representative or agent of [Edge Capital] to terminate or modify its relationship with [Edge Capital] or any other Affiliated Company, or in any way intentionally interfere with the business relationship between [Edge Capital] or such Affiliated Company and such other party (including, without limitation, making any negative or disparaging statements regarding [Edge Capital] or such Affiliated Company), provided, the foregoing shall not be violated by any truthful testimony given by the Management Company or any Principal in any legal proceeding.

*Id.* at § 2.13(b) (emphasis added).

32.     In other words, among other things, the Solicitation and Hiring Covenant purports to prohibit Plaintiffs from, (i) initiating contact with for the purpose of hiring, or hiring, without any solicitation whatsoever, any employee (or former employee) of Edge Capital or Defendants' Affiliated Companies; or (ii) counseling, advising, or otherwise encouraging such employees to leave the employment of Edge Capital or Defendants' Affiliated Companies, and in both instances regardless of geographic location or whether Plaintiffs had any contact, material or otherwise, with them. *Id.*

33.     As intentionally written, the Solicitation and Hiring Covenant is grossly overbroad, illegal and unenforceable.

**Confidentiality Covenant**

34.     Section 2.10(b) of the Management Agreement contains a "Confidential

Information" restrictive covenant (the "Confidentiality Covenant"), which provides as follows:

> During the term of this Agreement **and thereafter**, the [ECG] and **each Principal**
> shall keep **all Confidential Information[5]** strictly confidential and, other than in
> connection with the performance of the Services in compliance with the terms and
> conditions of this Agreement, **shall not disclose any Confidential Information to**
> **any third party** and **shall not use** any **Confidential Information** for the **benefit**
> **of anyone** other than the Affiliated Companies.

*Id.* at § 2.10(b) (emphasis added).

35.     In other words, among other things, the Confidentiality Covenant purports to

***perpetually*** prohibit Plaintiffs from using or disclosing to a third party *any* non-public information

---

[5] The term "Confidential Information" is circularly and ambiguously defined to include "certain
**valuable confidential and proprietary information** of the **Company**, **Focus**, and **their affiliates**
(collectively, the 'Affiliated Companies', and each individually, an 'Affiliated Company'), and of
third parties who have supplied such information to the Affiliated Companies under obligations of
confidentiality[.]" *Id.* at § 2.10(a). The Management Agreement further states that "Confidential
Information does include, **without limitation**, the Affiliated Companies' trade secrets; financial
data; business and management information, including, but not limited to, internal practices and
procedures; business and management development plans, including, but not limited to, proposed
or actual plans regarding acquisitions (including the identity of any acquisition contacts),
divestitures, asset sales, and mergers; and any information designated as confidential by the
policies of the Affiliated Companies." *Id*. (emphasis added). Such information is considered
"Confidential Information" regardless of "whether or not provided directly to the [ECG] or any
Principal, whether or not the [ECG] or any Principal is given access to the information, whether
or not the information is inadvertently disclosed to the [ECG] or any Principal, and whether or not
the information is marked or designated as confidential." *Id.* However, the following categories of
information are specifically excluded from the definition of "Confidential Information": "(a)
information that is publicly known (other than as a result of the [ECG's] or any Principal's
wrongful actions or inactions or as a result of a breach of any of their respective obligations
hereunder), including, without limitation, general industry information and information which is
generally publicly available or is otherwise in the public domain without breach of this Agreement,
(b) information which the [ECG] or any Principal has lawfully acquired from a source other than
the Affiliated Companies or the Seller, (c) information which is required to be disclosed pursuant
to any law, regulation or rule of any governmental body or authority or court order, or (d)
information released for disclosure with Focus' prior written consent (in the sole discretion of
Focus)."

related to the "business" or "management" of Defendants, or any of Defendants' Affiliated Companies, without regard to the sensitivity of that information, the staleness of that information, or whether that information actually constitutes a trade secret or is otherwise proprietary and/or confidential.

36.    As intentionally written, the Confidentiality Covenant is grossly overbroad, illegal and unenforceable.

37.    The circumstances are such, including Defendants' specific intent to obtain the benefit of improperly overbroad and anticompetitive covenants, that Defendants are not entitled to Court action that limits, rewrites or otherwise blue pencils any of the Covenants at issue. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 394 (1999).  Nor can they accomplish such limitation by unilateral conduct.

38.    The Management Agreement also purports to bind Plaintiffs to a provision mandating alternative dispute resolution (the "Arbitration Provision") for certain types of claims:

> **Other than a proceeding seeking a preliminary injunction, temporary restraining order or other equitable relief, disputes relating to termination of this Agreement and disputes over events leading to liquidated damages, which shall be governed by Section 8.3**, any claim, dispute or controversy arising out of or relating to the interpretation, application or enforcement of this Agreement, any document or instrument delivered pursuant to or in connection with this Agreement, or any breach of this Agreement or any such document or instrument (an "Arbitrable Dispute") shall be resolved pursuant to [the mandatory mediation and arbitration provisions within] this Section 8.2.

*Mgmt. Agmt.* at § 8.2 (emphasis added).

39.    As set forth in more detail below, this action is excluded from the Arbitration Provision because each of Plaintiffs' claims "relate to [the] termination of" the Management Agreement, and further because such claims seek relief that falls directly within types carved out of the Arbitration Provision, including: (1) a temporary restraining order and preliminary

injunction; and (2) "other equitable relief" including this Court's declaration that the Solicitation and Service Covenant, Solicitation and Hiring Covenant, and Confidentiality Covenant are unenforceable.

40.     Thus, Plaintiffs' claims fall under Section 8.3 of the Management Agreement, which provides that:

> Any action, suit or proceeding arising out of, under or in connection with this Agreement which is **not an Arbitrable Dispute under Section 8.2** may be brought and determined in **the appropriate federal or state court in the County of New York, State of New York.** The parties hereby **irrevocably submit to the jurisdiction** of any such state court or federal court in the County of New York, State of New York, in any such suit, action or proceeding arising out of or relating to this Agreement. Each party hereby waives, to the extent permitted by law, its right to a trial by jury for any such suit, action or proceeding arising out of or relating to this Agreement.

*Id.* at § 8.3 (emphasis added).

41.     Additionally, in connection with the sale of Edge Capital Partners' assets to Edge Capital on August 1, 2018, Plaintiffs separately entered into an agreement titled Non-Competition and Non-Solicitation Agreement ("the NCNS Agreement") with Focus and Edge Capital. The restrictive covenants in the NCNS Agreement expired on August 1, 2023 and are not at issue in this action. By contrast, the Covenants in the Management Agreement are associated with Plaintiffs' employment with ECG, not the sale of Edge Capital Partners' assets and are in dispute.

**Plaintiffs Resign In The Face Of An Impending Acquisition Of ECG And Edge Capital By SCS**

42.     On August 31, 2023, funds affiliated with the private equity firms Clayton, Dubilier & Rice, LLC ("CD&R") and Stone Point Capital, LLC ("Stone Point") completed an acquisition of Focus Financial Partners, Inc.

43.     SCS became a wholly owned subsidiary of Focus Financial Partners, Inc. in May of 2017.

44.     Collectively, Defendants, Focus Financial Partners, Inc., and the private equity firms that control them to a common design represent a significant impact on certain sectors of the financial services industry, such that anticompetitive activity by them has a significant impact on the financial services industry and is worthy of Court and regulatory scrutiny.

45.     On December 11, 2024, Defendant Focus distributed a Letter of Intent to ECG's members which set forth Defendant Focus' proposal for the acquisition of ECG and Defendant Edge Capital by Defendant SCS (the "Letter of Intent").

46.     In the Letter of Intent, Focus promised Plaintiffs, "a mutually beneficial and rewarding transaction" among Defendant Focus, Defendant Edge Capital, Defendant SCS, and Ferdinand FFP Ultimate Holdings, LP ("Ferdinand"), a subsidiary of the funds associated with CD&R and Stone Point.

47.     The acquisition was to be effectuated through Defendant SCS's and Ferdinand's purchase of substantially all of both ECG's and Edge Capital's assets.

48.     Following the closing, Plaintiffs were to become at-will employees of SCS.

49.     Although Defendants waited until the eve of closing on the contemplated transaction, Defendant Focus finally informed Plaintiffs that, in connection with the transaction, the basic structure of the arrangement with them would change such that, although they would be able to keep all their existing clients, they would keep the majority of those clients on terms that were less favorable to the clients and to them.

50.     Moreover, for various reasons, the acquisition favored certain people at ECG at Plaintiffs expense.

51.     While Plaintiffs advocated against the transaction, ECG's largest partners voted to approve the acquisition over Plaintiffs' objections and concerns.

52. However, as joining Defendant SCS was not financially viable for Plaintiffs and was disadvantageous to their clients, Plaintiffs announced their intention to resign.

53. On or about January 6, 2025, Plaintiffs were sidelined by Defendants. They were prohibited from entering the office and cut off from all emails. Although still affiliated with ECG, Plaintiffs could not serve their clients, and neither Focus nor Edge Capital assigned those clients another advisor.

54. Instead, during the week of January 6, Edge Capital and Focus contacted Plaintiffs' clients and tried to convince each client to stay with Edge Capital and Focus. They also sold each client on the new transaction, and upon information and belief, misled the clients into believing Plaintiffs had already resigned.

55. On information and belief, Harry Jones ("Jones"), a managing member of ECG, at the direction of Defendants or with Defendants' knowledge, then launched a campaign of that damaged Plaintiffs' reputation within the investment advisory industry in order to further advance their anti-competitive goals.

56. Among other acts, Jones: (i) told a representative of Goldman Sachs that ECG and Edge Capital had to "get rid of [Plaintiffs]" in order to effectuate the deal with SCS; and (ii) told an individual that could refer clients to Plaintiffs that Jones had "fired" Patrick.

57. Upon information and belief, other members of ECG have made false, misleading, or disparaging comments about Plaintiffs.

**Plaintiffs Join New Edge**

58. Following their resignation from ECG, Plaintiffs joined NewEdge Wealth, LLC ("NewEdge") as RIAs.

59. Notwithstanding any similarities in names, NewEdge is not affiliated with

Defendants and has been in existence since at least 2015.

60.    After learning of Plaintiffs' departure from ECG, many of Plaintiffs' long-time clients reached out to Plaintiffs and requested that Plaintiffs continue managing their wealth at NewEdge.

61.    In an effort to restrain these clients and other clients from working with the RIAs of their choice, Defendants sent Plaintiffs cease and desist letters accusing them of violating the Covenants.

62.    Thereafter, Counsel for Focus and Edge Capital sent Plaintiffs Notices of Demand for Mediation indicating that Defendants were "seek[ing] to recover the revenues lost due to" Plaintiffs' alleged violation of the Covenants. The mediation took place on May 15, 2025 and was unsuccessful.

63.    To further extend the reach of the already overbroad Covenants, SCS has also asserted that it has standing to enforce both the Arbitration Provision and Covenants on behalf of Edge Capital on account of an alleged assignment of Edge Capital's rights and obligations under the Management Agreement in connection with SCS's acquisition of Edge Capital.

64.    On June 5, 2025, Defendants filed a Demand for Arbitration and a Statement of Claim before the American Arbitration Association ("AAA") in which they accuse Plaintiffs of violating the Covenants and seek millions in damages.

65.    Defendants continue to represent that they intend to enforce the terms of the Covenants.

66.    Plaintiffs continue to believe the Covenants are overbroad and unenforceable as a matter of law and that the claims Plaintiffs assert herein are excluded from any arbitration agreement.

## FIRST CAUSE OF ACTION
### 28 U.S.C. § 2201
### (Declaratory Judgment Concerning The Enforceability Of The Solicitation and Service Covenant)

67.     Plaintiffs repeat and reallege by reference each and every allegation above as if fully set forth herein.

68.     An actual controversy has arisen and now exists between the Parties concerning their respective rights, duties, and obligations under the Solicitation and Service Covenant located at Section 2.13(a) of the Management Agreement. *Mgmt. Agmt.* at § 2.13(a).

69.     Specifically, an actual controversy has arisen and now exists between the Parties concerning whether the Solicitation and Service Covenant is enforceable, and, if so, to whom it applies. *Id.*

70.     Plaintiffs believe and contend that the Solicitation and Service Covenant is overbroad and unenforceable as drafted and is incapable of being reformed.

71.     New York courts disfavor restrictive covenants and will only enforce those which are reasonable. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999).

72.     Courts evaluating the enforceability of a restrictive covenant employ a three-part test and hold that "[a] restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Id.* A violation of any prong renders a restrictive covenant unenforceable. *Id.*

73.     As set forth below, the Solicitation and Service Covenant violates each prong of the seminal *BDO Siedman* test, as well as other aspects of New York law, and is thus unenforceable on its face. *Id.*

74.     First, the myriad restraints imposed by the Solicitation and Service Covenant are

far greater than necessary to protect Defendants' legitimate business interests because, among other deficiencies, the Solicitation and Service Covenant: (i) has no "material contact" requirement; (ii) applies to mere "prospective" clients, regardless of whether Plaintiffs have ever even heard of them; (iii) prohibits Plaintiffs from servicing clients who they did not directly or indirectly solicit; (iv) lacks any geographic limitation; and (v) applies to clients and prospective clients who were not clients or prospective clients of Defendants while Plaintiffs were employed.

75.    The Solicitation and Service Covenant's lack of material contact requirement renders it facially overbroad as a matter of well settled law. It is axiomatic that "[a] covenant will be rejected as overly broad…if it seeks to bar the employee from soliciting or providing services to clients with whom the employee *never acquired a relationship* through his or her employment[.]" *Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*, 9 A.D.3d 805, 806 (3d Dep't 2004) (citing *BDO Seidman*, 93 N.Y.2d at 393 (emphasis added); *See also Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 370-71 (2015) (non-solicitation clause overbroad "to the extent that it prohibited [the defendant] from working with any of plaintiffs' New York customers, even those [the defendant] had never met, did not know about and for whom she had done no work") (emphasis in original).

76.    The lack of a material contact requirement in the Solicitation and Service Covenant is particularly problematic because it extends not only to Defendants, but also to unknown Affiliated Companies. For example, as drafted, the non-solicitation provision would extend to a hypothetical client who joined a Focus affiliate firm in California after Plaintiffs left the company, and with whom Plaintiffs have had no contact whatsoever. *Mgmt. Agmt.* at § 2.13(a).  Making matters worse, Plaintiffs would have no way of knowing that Defendants claimed proprietary rights in such a client.

77.    The Solicitation and Service Covenant is also overbroad because it purports to prohibit the solicitation of mere "Prospective Clients" of Defendants and the Affiliated Companies. New York courts have declined to enforce restrictive covenants which extend to prospective, potential, or future clients on the grounds that an employer does not have any legitimate interest in customers with whom the employer has no established relationship. *See Mercer Health & Benefits, LLC v. DiGregorio*, 307 F. Supp. 3d 326, 334, 351 (S.D.N.Y. 2018) (declining to issue a preliminary injunction to enforce a non-solicitation covenant prohibiting defendant's contact with prospective clients, reasoning that "no protectable client relationship can arise until the employer has engaged a potential customer as a client; *merely soliciting a client is insufficient* [to create a protectable interest].") (emphasis added).

78.    The Solicitation and Service Covenant is also overbroad because it prohibits Plaintiffs from *servicing* clients of Defendants and the Affiliated Companies who Plaintiffs did not directly or indirectly solicit. *See Deloitte & Touche, LLP v. Chiampou*, 222 A.D.2d 1026, 2017 (4th Dep't 1995) (declining to issue injunction prohibiting defendants from servicing "plaintiff's former clients who had voluntarily and without solicitation sought out defendants after defendants left plaintiff's employ"); *E. Bus. Sys., Inc. v. Specialty Bus. Sols., LLC*, 292 A.D.2d 336, 338 (2d Dep't 2002) ("to balance the equities, the scope of the preliminary injunction should not apply to…any persons or entities who, without solicitation, approach the [defendants] and request that they provide service"); and *Leon M. Reimer & Co., P.C. v. Cipolla*, 929 F.Supp. 154, 158-59 (S.D.N.Y. 1996) (restrictive covenant was unreasonable to the extent it "would prohibit [the defendant] from accepting an engagement from [the plaintiff's] client who voluntarily and without any prior solicitation by [the defendant] contacts him and seeks to retain him.")

79.    The Solicitation and Service Covenant is also overbroad because it lacks any

geographic limitation. *See Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 220 (S.D.N.Y. 2013) ("[i]t is axiomatic…that non-compete clauses and nonsolicitation provisions, even where protecting legitimate interests, must be reasonably limited both temporally *and geographically* in order to withstand judicial scrutiny, as reasonableness will not be found where restrictive covenants act to unreasonably limit trade and burden an individual's livelihood.") (emphasis added).

80.     Second, enforcement of the Solicitation and Service Covenant would impose undue hardship on Plaintiffs because, as discussed above, it would prevent them from soliciting or servicing countless individuals with whom they had no contact or knowledge of while working with for ECG, and whose identity as an allegedly off-limits customer or potential customer cannot be ascertained. Indeed, because the Solicitation and Service Covenant also broadly applies to clients, "Prospective Clients", and former clients of the Affiliated Companies, it would be next to impossible for Plaintiffs to know who they could or could not solicit or service, and thus to conform their conduct so as not to violate this provision.  New York law does not allow former employers to use such vague and ambiguous language to chill otherwise appropriate competition and business activities.

81.     Third, enforcement of the Solicitation and Service Covenant would be injurious to the public interest. New York has a strong policy against the enforcement of overbroad restrictive covenants.  *See, e.g.*, *Long Island Minimally Invasive Surgery, P.C. v. St. John's Episcopal Hosp.*, 164 A.D.3d 575, 577 (2d Dep't 2018) ("[a]greements restricting an individual's right to work or compete are not favored and thus are strictly construed") (citation omitted). Moreover, courts and regulators have clearly established that agreements that interfere with the public's right to transfer their financial accounts to follow a preferred financial advisor, as does the Solicitation and Service Covenant, are contrary to the public interest. *See, e.g.*, *Barney v. Burrow*, 558 F. Supp. 2d 1066,

1084 (E.D. Cal. 2008) ("the public interest is better served with open competition in the securities field and access to advisors of clients' choice"); *First Empire Securities, Inc. v. Miele*, 17 Misc.3d 1108(A), 2007 N.Y. Slip Op. 51884(U), 2007 WL 2894245, at *4  (Sup. Ct., Suffolk Co., Aug. 10, 2007)  ("[t]he Court agrees that [the FINRA] rules do not permit business entities and individuals governed by those rules to restrict customers from freely choosing the person or entity with which they wish to do business (see FINRA Rules 2110–7). Therefore, to the extent that the restrictive covenant signed by the [the defendant] attempts to prevent the [the defendant] from taking orders from former clients who contact him *without solicitation* by the [the defendant], it is *not reasonable*.") (emphasis added).

82.    The Solicitation and Service Covenant cannot be judicially reformed because, among other things, it is the product of Defendants' "overreaching, coercive use of dominant bargaining power, [and] other anti-competitive misconduct". *BDO Seidman*, 93 N.Y.2d at 394.

83.    It is clear that Defendants Focus and Edge Capital imposed and insisted on the Solicitation and Service Covenant in bad faith, knowing full well that it was overbroad under well-established New York law. *See, e.g., Veramark Techs., Inc. v. Bouk*, 10 F. Supp. 3d 395, 407 (W.D.N.Y. 2014) ("[c]ourts have held that partial enforcement is inappropriate where an employer attempts to prohibit solicitation of its entire customer base after the *BDO Seidman* decision"); *Scott, Stackrow & Co., C.P.A.'s, P.C.*, 9 A.D.3d at 808 (declining to partially enforce a non-solicitation provision where, inter alia, the "plaintiff continued to require defendant to sign the agreement after the issuance of *BDO Seidman*, which deemed unreasonable a similar anticompetition agreement prohibiting the solicitation of an accounting firm's entire client base and served as notice to plaintiff that the agreement at issue here was also overly broad.")

84.    The Management Agreement was drafted in or about August of 2018, nearly 20

years after the New York Court of Appeals issued its seminal and brightline decision in *BDO Seidman* that a restrictive covenant cannot bar an employee from soliciting clients with whom the employee never acquired a relationship through his employment. 93 N.Y.S.2d at 392.

85.     Additionally, when Defendants Focus and Edge Capital acquired the assets of Edge Capital Partners, the Management Agreement was presented to them on a take-it-or-leave-it basis, which is demonstrative of abuse of bargaining power and militates against partial enforcement. *See Scott, Stackrow & Co., C.P.A.'s, P.C.*, 9 A.D.3d at 807 (explaining that "[f]actors weighing against partial enforcement" include "the imposition of the covenant in connection with hiring or continued employment…as opposed to, for example, imposition in connection with a promotion to a position of responsibility and trust[.]")

86.     Finally, further militating against partial enforcement is that Defendants and their representatives used their bargaining power in connection with SCS acquisition to breach fiduciary duties, freeze Plaintiffs out of the enterprise and essentially force their resignation. *See Arakelian*, 735 F. Supp. at 22  ("New York courts 'will not enforce a non-competition provision in an employment agreement where the former employee was involuntarily terminated.'") Having profoundly breached their duties to Plaintiffs and driven them from Defendants' employment, Defendants cannot now ask this Court to rewrite their overbroad restrictions to further benefit themselves.

87.     In sum, Plaintiffs believe and contend that the Solicitation and Service Covenant is irredeemably overbroad and cannot be enforced. *Mgmt. Agmt.* at § 2.13(a).

88.     In contrast, as evidenced by arbitration proceedings initiated by Defendants on June, 5, 2025, Defendants contend that the Solicitation and Service Covenant is enforceable and seek money damages for its alleged breach.

89.     Plaintiffs have immediate opportunities to engage in activity that they believe to be appropriate and protected. Defendants continued threats and refusal to acknowledge the unenforceability of the Covenants and initiation of arbitration is having a chilling effect on Plaintiffs, their clients and their potential clients.

90.     Therefore, a judicial determination as to the enforceability of the Solicitation and Service Covenant is now necessary so that the Parties can assess their rights and duties under Section 2.13(a) of the Management Agreement.

91.     Accordingly, Plaintiffs request entry of judgment in their favor declaring that the Solicitation and Service Covenant is irredeemably overbroad, cannot be judicially reformed, and is unenforceable as a matter of law. *Mgmt. Agmt.* at § 2.13(a).

## SECOND CAUSE OF ACTION
### 28 U.S.C. § 2201
### (Declaratory Judgment Concerning The Enforceability Of The Solicitation and Hiring Covenant)

92.     Plaintiffs repeat and reallege by reference each and every allegation above as if fully set forth herein.

93.     An actual controversy has arisen and now exists between the Parties concerning their respective rights, duties, and obligations under the Solicitation and Hiring Covenant. *Mgmt. Agmt.* at § 2.12(b).

94.     Specifically, an actual controversy has arisen and now exists between the Parties concerning whether the Solicitation and Hiring Covenant is enforceable.

95.     Courts evaluating the enforceability of a restrictive covenant employ a three-part test and hold that "[a] restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman*, 93 N.Y.2d at 388. *See also*

*MasterCard International Incorporated v. Nike, Inc.*, 164 F. Supp. 3d 592, 600 (S.D.N.Y. 2016) (holding that "the reasonableness test set forth in *BDO Seidman* applies to non-recruitment provisions").

96.     Plaintiffs believe and contend that the Solicitation and Hiring Covenant imposes restraints which are greater than necessary to protect any legitimate business interests Defendants might have because it purports to prohibit Plaintiffs from, *inter alia*, (i) initiating contact with for the purpose of hiring, or hiring, without any solicitation whatsoever, any employee (or former employee) of Defendant Edge Capital or the Affiliated Companies; or (ii) counseling, advising, or otherwise encouraging such employees to leave the employment of Defendant Edge Capital or the Affiliated Companies, and in both instances regardless of the geographic location of those employees or whether Plaintiffs had any contact, material or otherwise, with the employees during their employment with Defendants.

97.     "A restrictive covenant that forbids solicitation of employees must be tailored so that it protects against 'the misappropriation of the employer's trade secrets or of confidential customer lists or competition by a former employee whose services are unique or extraordinary.'" *Permanens Capital, L.P. v. Bruce*, No. 21-cv-10525, 2022 WL 4298731, at *1 (S.D.N.Y. Sep. 19, 2022) (citing *BDO Seidman*, 93 N.Y.2d at 389).

98.     As discussed, the Solicitation and Hiring Covenant goes *well* beyond that, prohibiting Plaintiffs from soliciting or hiring *any* of Defendants or their "Affiliated Companies" employees "in any way whatsoever." *Id*. It applies to every employee of Defendants and their "Affiliated Companies", without regard to the location of the employee, the type of role the employee holds, what type of skills they possess, their value to Defendants, any connection to Plaintiffs or the existence of a competitive advantage for Plaintiffs. *See also In Re Document*

*Securities Litigation*, 275 F. Supp. 3d 454, 466-69 (S.D.N.Y. 2017) (holding unenforceable a non-recruitment provision which prohibited employees, during their employment and for a period of twelve months thereafter, from "attempt[ing] to hire, solicit, induce, recruit or encourage any other employees or agents of [the company] to terminate their employment")

99.     The Solicitation and Hiring Covenant is thus overbroad in scope, fails the reasonableness test established in *BDO Seidman* and is unenforceable as a matter of law. 93 N.Y.2d at 388.

100.     The Solicitation and Hiring Covenant cannot be judicially reformed because the Management Agreement is the product of Defendants' "overreaching, coercive use of dominant bargaining power, [and] other anti-competitive misconduct" *BDO Seidman*, 93 N.Y.2d at 394, and because Defendants are actively engaged in pursuing anticompetitive activities.

101.     In contrast, as evidenced by arbitration proceedings initiated by Defendants on June, 5, 2025, Defendants contend that the Solicitation and Hiring Covenant is enforceable and seek money damages for its alleged breach.

102.     Therefore, a judicial determination as to the enforceability of the Solicitation and Hiring Covenant is now necessary so that the Parties can assess their rights and duties under Section 2.13(b) of the Management Agreement.

103.     Accordingly, Plaintiffs request entry of judgment in their favor declaring that the Solicitation and Hiring Covenant is irredeemably overbroad, cannot be judicially reformed, and is unenforceable as a matter of law. *Mgmt. Agmt.* at § 2.13(b).

### THIRD CAUSE OF ACTION
**28 U.S.C. § 2201**
**(Declaratory Judgment Concerning The Enforceability Of The Confidentiality Covenant)**

104.     Plaintiffs repeat and reallege by reference each and every allegation above as if

fully set forth herein.

105.    An actual controversy has arisen and now exists between the Parties concerning their respective rights, duties, and obligations under the Confidentiality Covenant. *Mgmt Agmt.* at § 2.10(b).

106.    Specifically, an actual controversy has arisen and now exists between the Parties concerning whether the Confidentiality Covenant is enforceable.

107.    Courts evaluating the enforceability of a restrictive covenant employ a three-part test and hold that "[a] restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman*, 93 N.Y.2d at 388.

108.    The Confidentiality Covenant is overbroad in scope and duration and is unenforceable as a matter of law for multiple reasons. *See Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*, 59 A.D.3d 97, 102 (1st Dep't 2008) (holding that confidentiality agreements are only enforceable "to the extent that they are "'reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.'" (quoting *BDO Seidman*, 93 N.Y.2d at 388-89) (internal citation omitted).

109.    First, the Confidentiality Covenant is overbroad in scope. The Confidentiality Covenant broadly extends to "***without limitation***, [Defendants' and their] Affiliated Companies' trade secrets; financial data; ***business and management information***…and any information designated as confidential by the policies of the [Defendants and their] Affiliated Companies." *Mgmt. Agmt.* at § 2.10(a).

110.    The Confidentiality Covenant thus encompasses *any* non-public information

related to the "business" or "management" of Defendants, or any Defendants' numerous "Affiliates Companies", without regard to the sensitivity of that information, whether that information constitutes a trade secret or whether it is otherwise propriety and/or confidential.

111.     For example, as drafted, the Confidentiality Covenant would prohibit Plaintiffs from discussing the salary they earned from Defendants during a job interview, or explaining to a long-time client an investment strategy that the Plaintiffs employed for that client while working for Defendants Focus and Edge Capital, or from even identifying any parking spaces they might have been assigned by Defendants. Defendants clearly do not have a protectable interest in such information.  As such, the Confidentiality Covenant is unreasonable and unenforceable under *BDO Siedman*, 93 N.Y.2d at 388. *See Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496, 498-99 (1977) (finding nondisclosure provision preventing employee from disclosing "to any person, firm or corporation…any [] information that [the employee] has or shall have acquired during his period of employment" to be overbroad, because "its broad-sweeping language is unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness").

112.     Second, the Confidentiality Covenant is radically overbroad in duration. The Confidentiality Covenant contains *no temporal limitation whatsoever*. Rather it is **perpetual**. This is unreasonable under long-standing black letter law. *See Airline Delivery Servs. Corp. v. Lee*, 72 A.D.2d 731 (1st Dep't 1979) ("[i]n the covenant presently under consideration there is noticeably absent a limitation as to time. Courts have long recognized that covenants which perpetually restrict an employee from working for another are invalid and must fail.")

113.     The Confidentiality Covenant cannot be judicially reformed because the Management Agreement is the product of Defendants' "overreaching, coercive use of dominant

bargaining power, [and] other anti-competitive misconduct". *BDO Seidman*, 93 N.Y.2d at 394.

114.    In contrast, as evidenced by arbitration proceedings initiated by Defendants on June, 5, 2025, Defendants contend that the Confidentiality Covenant is enforceable and seek money damages for its alleged breach.

115.    Therefore, a judicial determination as to the enforceability of the Confidentiality Covenant is now necessary so that the Parties can assess their rights and duties under Section 2.10 of the Management Agreement.

116.    Accordingly, Plaintiffs request entry of judgment in their favor declaring that the Confidentiality Covenant is irredeemably overbroad, cannot be judicially reformed, and is totally unenforceable as a matter of law. **Ex A**, *Mgmt. Agmt.* at § 2.10.

## FOURTH CAUSE OF ACTION
### (Injunctive Relief -- Temporary, Preliminary and Permanent)

117.    Plaintiffs repeat and reallege by reference each and every allegation above as if fully set forth herein.

118.    A party is entitled to a temporary restraining order or preliminary injunction if it can demonstrate that they have or are likely to suffered irreparable harm, that they have a likelihood of success on the merits, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Martin v. Warren*, 482 F. Supp. 3d 51, 68 (W.D.N.Y. 2020)

119.    The standard under New York Law is essentially the same.  Pursuant to CPLR. § 6301:

> A preliminary injunction may be granted in any action where it appears that the defendant threatens or is about to do, or is doing or procuring or suffering to be done, **an act in violation of the plaintiff's rights respecting the subject of the action**, and tending to render the judgment ineffectual, or in any action where the plaintiff has demanded and would be entitled to a judgment restraining the defendant from the commission or continuance of an act, which, **if committed or continued during the pendency of the action, would produce injury to the**

**plaintiff**.

CPLR § 6301. (emphasis added).

120.    As set forth above, Plaintiffs are likely to prevail on the merits of their claims that the Covenants are irredeemably overbroad, cannot be judicially reformed, and are totally unenforceable as a matter of law. *Mgmt. Agmt.* at §§ 2.10-2.13.

121.    Unless immediate, temporary and permanent relief are granted to Plaintiffs preventing Defendants from enforcing or attempting to enforce the Covenants, Plaintiffs will be irreparably harmed and without an adequate remedy at law.

122.    Here, enforcement   the Covenants would essentially prevent Plaintiffs from working in the investment advisory business in any manner and would therefore irreparably damage their careers and ability to earn a livelihood -- all in derogation of New York law and public policy.

123.    The Covenants also represent blatant violation of New York public policy and the balancing of the equities weighs in favor of granting Plaintiffs' request for injunctive relief. *See Post*, 48 N.Y.2d at 86 ("powerful considerations of public policy…militate against sanctioning the loss of a man's livelihood"); *See also* FINRA Rule 2140 (clearly articulating a public policy in favor of the free transfer of client accounts by providing that "[n]o member or person associated with a [FINRA] member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative where the account is not subject to any lien for monies owed by the customer or other bona fide claim").

124.    As a result, Plaintiffs are entitled to and request an injunction temporarily, preliminarily and permanently restraining and enjoining Defendants from: (i) enforcing, seeking to enforce or threatening to enforce the Covenants and (ii) from representing to anyone with whom

Plaintiffs might do business that the Covenants are enforceable, along with such other relief as may be shown to be appropriate.

## FIFTH CAUSE OF ACTION
### 28 U.S.C. § 2201
### (Declaratory Judgment Concerning The Applicability And Enforceability Of Arbitration Provision)

125.    Plaintiffs repeat and reallege by reference each and every allegation above as if fully set forth herein

126.    An actual controversy has arisen and now exists between the Parties concerning their respective rights, duties, and obligations under the Arbitration Provision. *Mgmt. Agmt.* at § 8.2(b).

127.    Specifically, an actual controversy has arisen and now exists between the Parties concerning whether Plaintiffs are required to arbitrate their claims for declaratory judgment and injunctive relief as set forth in Plaintiffs' First, Second, Third, and Fourth Causes of Action.

128.    Plaintiffs' contend their claims for declaratory judgment and injunctive relief are exempt from arbitration under the plain and unambiguous terms of Arbitration Provision, which does not require the arbitration of claims (1) "relating to [the] termination of [the Management Agreement]," (2) which seek "a preliminary injunction, temporary restraining order or (3) which seek ***other equitable relief***". **Ex. A**, *Mgmt. Agmt.* at § 8.2(b) (emphasis added).

129.    Plaintiffs' claim for injunctive relief in their Fourth Cause of Action is explicitly exempted from the Arbitration Provision. *Id*.

130.    Plaintiffs' claims for declaratory judgment concerning the unenforceability of the Covenants seek "other equitable relief" and therefore are also exempt from the Arbitration Provision. *Id*. A declaratory judgment regarding the enforceability of a restrictive covenant is a quintessential form of equitable relief. *See Herskovitz v. Todd Co.*, 85 N.Y.S.2d 707, 710 (Sup. Ct.

1949) (explaining that the plaintiff's action seeking a declaratory judgment that the "[restrictive] covenant in [his employment] contract is void and unenforcible as matter of law… is one ***in equity***") (emphasis added).

131.    Moreover, each of Plaintiffs' claims "relate[] to the termination of the Management Agreement" following their departure from the Defendants' employ and are likewise exempt from arbitration on such basis. *Mgmt. Agmt.* at § 8.2(b) (emphasis added).

132.    In contrast, as evidenced by arbitration proceedings initiated by Defendants on June 5, 2025, Defendants are believed to contend that Plaintiffs must arbitrate the claims asserted herein.

133.    Therefore, a judicial determination as to whether Plaintiffs are required to arbitrate their claims for declaratory judgment and injunctive relief is now necessary so that the Parties can assess their rights and duties under the Arbitration Provision. *Id.*

134.    Accordingly, Plaintiffs request entry of judgment in their favor declaring that their claims for declaratory judgment and injunctive relief are not subject to the Arbitration Provision.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request judgment as follows:

A.    A declaratory judgment against the Defendants:

i.    That the Solicitation and Service Covenant is irredeemably overbroad and unenforceable as a matter of law;

ii.    That the Solicitation and Hiring Covenant is irredeemably overbroad and unenforceable as a matter of law;

iii.    That the Confidentiality Covenant is irredeemably overbroad and unenforceable as a matter of law; and

iv.    That the Covenants cannot be reformed or limited;

B.     For a temporary restraining order and preliminary injunction:

i.     staying arbitration proceedings initiated by Defendants against Plaintiffs in the American Arbitration Association on or about June 5, 2025 during the pendency of this action;

ii.     precluding Defendants, and those with whom they act in concert, from otherwise enforcing or seeking to enforce (directly or indirectly) the Covenants

iii.     such other relief as may be shown to be appropriate;

C.     A declaratory judgment against the Defendants:

i.     That Plaintiffs' claims for declaratory judgment and injunctive relief are not subject to the Arbitration Provision;

D.     Entry of a permanent injunction precluding Defendants from seeking to enforce the Covenants; and

E.     Such other and further relief as this Court deems just and proper.

Dated: June 16, 2025

[signatures on following page]

By:      */s/Robert Lufrano*
         Robert Lufrano
         **BAKER, DONELSON, BEARMAN,**
         **CALDWELL & BERKOWITZ, PC**
         4365 Route 1 South, Suite 301
         Princeton, New Jersey 08540
         (609) 490-4860
         rlufrano@bakerdonelson.com

         Steven Hall, GA Bar # 319308 (*pro hac vice* application forthcoming)
         Kristin Tucker, GA Bar # 805833 (*pro hac vice* application forthcoming)
         **BAKER, DONELSON, BEARMAN,**
         **CALDWELL & BERKOWITZ, PC**
         3414 Peachtree Road, NE, Suite 1500
         Atlanta, Georgia 30326
         (404) 577-6000
         shall@bakerdonelson.com
         ktucker@bakerdonelson.com

         *Attorneys for Plaintiff James T. Patrick*

By:      */s/Michael S. Mosscrop*
         Michael S. Mosscrop
         **FRANKLIN, GRINGER & COHEN, P.C.**
         666 Old Country Road, Suite 202
         Garden City, New York 11530
         (516) 228-3131
         mmosscrop@franklingringer.com

         Matthew M. Wilkins, GA Bar # 142291 (*pro hac vice* application forthcoming)
         **KING, YAKLIN & WILKINS, LLP**
         192 Anderson Street, Suite 125
         Marietta, GA 30060
         (770) 424-9235
         mwilkins@kingyaklin.com

         *Attorneys for Plaintiff William deButts*